Mabtih, P. J.
(dissenting). In this disciplinary proceeding two distinct charges of professional misconduct were filed against the respondent. The latter interposed an answer and *596 this court entered an order referring the matter to an official referee to take testimony and report with his opinion. Testimony-was taken. Both sides rested but, before briefs were submitted, the official referee died. The petitioner, the Association of the Bar of the City of New York, through its attorney, and the respondent, through his attorney, stipulated, consented and agreed that this court may “ upon the submission to it of the testimony, exhibits and briefs, pass directly upon the case and decide it without directing a new reference ” and “ that either side may thereafter move in this court upon the customary notice, for the court to take such action as it deems appropriate upon the evidence ”.
Thereafter on October 11, 1946, the petitioner moved this court to “ pass directly upon the evidence and determine the case ”, to adjudge the respondent “ guilty of professional misconduct ” and “ take such action herein as it may deem just and proper ”.
By their stipulation the respondent and the petitioner concede that in their opinion the record submitted to the court is sufficient to sustain a determination of the guilt or innocence of the respondent. Despite the above stipulation a majority of the court are of the opinion that the matter should be referred to another official referee to take testimony and to report thereon. We do not agree with that conclusion. The record, consisting of documentary evidence and testimony, in our opinion overwhelmingly establishes the guilt of this respondent and warrants his disbarment.
The two distinct charges of professional misconduct set forth in the petition are similar in nature. They relate to the fact that he induced his clients to execute papers reciting there were no mortgages upon properties with respect to which his clients sought consequential damages in condemnation proceedings, whereas, in fact, he knew there were outstanding mortgages. As a result awards were paid by the City of New York to the respondent’s clients and the respondent was paid his fees without notice to the respective mortgagees. The respondent was also charged with filing false claims in which he represented that there were no mortgages or liens on the properties of his clients and with inducing them falsely to represent that there were no such mortgages or liens.
Paragraph IV, subdivision (i) of the petition reads as follows.: “ (i) It is charged that the respondent has been guilty of professional misconduct in having his clients execute the papers above referred to, reciting that there were no mort *597 gages upon the properties affected when he, in fact, knew that there were outstanding mortgages thereon with the result that the awards were paid and the respondent received his contingent fees without notice to the respective mortgagees; that regardless of any information the respondent received from his clients with regard to outstanding mortgages the respondent was under a duty to ascertain from an examination of the appropriate records whether or not there were in fact unsatisfied mortgages of record, in view of the representations contained in the papers which he had his clients sign and in reliance upon which he knew or should have known that the city would make payment of the awards, and in failing to either make such a search or to report the facts accurately to the city it is further charged that the respondent was guilty of professional misconduct.”
In his answer the respondent denied that he knew that the lands in question were subject to mortgages or that he advised his clients to, disregard the fact that mortgages were in existence when they executed the papers required by the City of New York or that he was guilty of any professional misconduct. The testimony of respondent was a denial of all the charges.
The charges against the respondent grew out of condemnation proceedings brought by the City of New York in November, 1936, to acquire title to real property for the opening and extension of Exterior Street and other streets in Bronx County in connection with the building of the Triborough Bridge. The proposed improvement provided for the cutting off of certain property from access by water to the Mott Haven Canal. In the course of the proceedings the property owners deprived of such access to the canal were granted permission to file claims for consequential damages.
The first charge relates to a claim filed on behalf of the Stephens Fuel Company. That company retained the respondent on a 25% contingency basis to file its claim against the City of New York because of consequential damages to its property adjacent to the canal. It is important to note that at that time and for some time prior thereto mortgages aggregating $60,000 were held by the Bowery Savings Bank on the property of the Stephens Fuel Company.
A proof of claim was prepared in the office of the respondent on a form supplied by the city, technically described as an “ affidavit of title ”, and contained the following: “ That said lands are free and clear of all mortgages, taxes, assessments, encumbrances,. liens, transfers, charges, estates, rights, con *598 tracts of sale, special agreements, easements of every kind and nature, oral or written, recorded or unrecorded, except # # # 1 }
The form concludes with a statement, in large type, beneath the acknowledgment clause, as follows: “ Note: Do not sign and swear to this affidavit until after it has been carefully read, and is fully understood, as the statements herein contained are important. ’ ’
Mr. Carl Herbert Jaegels, president of the Stephens Fuel Company, executed thé affidavit of title. He said that thé word “ except ” had been stricken out of the form, which was given to him at his office by the respondent in person. Mr. Jaegels testified that he read the affidavit and spoke to the respondent about it. The testimony of Mr. Jaegels is set forth in the record at pages 7 and 8, as follows: “ Q. Did you have any conversation with relation to its contents with Mr. Shea? A. Yes, Down here in paragraph 5, ‘ that said lands are free and clear of all mortgages, taxes, assessments, encumbrances, liens, transfers, charges, estates, rights, contracts of sale, special agreements, easements of every kind and nature, oral or written, recorded or unrecorded.’ I called to Mr. Shea’s attention that we did have a mortgage on the property, as I recall it, in amount of approximately sixty thousand dollars, and there was nothing stated here about that mortgage, no remark stating that the mortgage was in effect, and Mr. Shea took the position — Q. No, tell what he said as nearly as you can recall. A. Well, Mr. Shea stated that we were not disposing of any of the real estate or any of the office that were on the mortgage, and that this was purely a suit for damages, and that there were no mortgages against us now, and that it was unnecessary that they should be mentioned. Well, I felt — Mr. Maurice: No, please,-leave out what you felt. What you said. The Witness: Well, I said under those circumstances, on the advice of counsel, I will sign the affidavit.”
In due course an award was allowed to the Stephens Fuel Company in the sum of $22,741 and, in connection therewith and for the purpose of obtaining payment by the City of New York, two documents were executed by Charles A. Matthews, the treasurer of the Stephens Fuel Company.
Mr. Matthews testified that he had his first conversation with respondent at the office of the Stephens Fuel Company on April 20, 1938, just before he went to the office of the comptroller to present the document which he that day executed. In that conversation Mr. Matthews told respondent that the board of *599 directors of the Stephens Fuel Company had authorized him to accept the award and to sign the necessary papers. Mr. Matthews and the respondent then discussed the question of the;mortgages on the property. Mr. Matthews ’ testimony is as follows: “ Q. Your best recollection. A. All right; my best recollection was inquiring of Mr. Shea if the mortgage had anything to do with this award for the company. Q. Is that all that was said about the mortgage? A. That was all that was said on my part. Q. What did he say? A.' Mr. Shea advised me that the mortgage had nothing to do with anything that we were receiving an award for. * * * Q. When you got down to the Comptroller’s office, tell us exactly what was said and done at the time of signing these papers? A. Well, there was nothing said — I retract that. Upon arrival at the Comptroller’s office, I was presented with these three papers to sign, and after reading them over, I passed them along to Mr. Shea, who was sitting at the same table to my left, and I asked him if they were all right to sign, and pointed out my affidavit on the back of this Exhibit 5, to where it says that there are no mortgages or liens of any description against said premises, and he looked at the papers and handed them back to me and said it was all right to sign; and thereafter he witnessed my signature on this Exhibit 5. Q. Then what happened? A. Well, we received a check for the award.”
Five days after the call to the comptroller’s office, the respondent submitted a bill for $5,518.02 for services he had rendered. He was paid by a check on April 29, 1938. During this entire time there were mortgages against the property in the sum of approximately $60,000.
The second charge is a separate and distinct charge. It related to property owned-by Francis B. Tinsley and Mary C. T. Tinsley. Their attorney, John V. Visco, retained the respondent to prosecute a claim for consequential damages to the property. The respondent was to be reimbursed on a 20% contingency basis. At that time the Mutual Life Insurance Company held a mortgage on the Tinsley property on which there was a balance of about $6,500. Shortly after-the respondent was retained, Mr. Visco delivered to him a deed to the property which deed recited that the property was subject to a mortgage. The respondent caused affidavits of title to be prepared in a form similar to that referred to in the Stephens Fuel Company claim. The affidavits of title were delivered to Mr. Visco who, on April 22, 1938, caused the Tinsleys to execute the affidavits. Mr. Visco returned the documents to the *600 respondent in a letter in which, he testified, he enclosed a memorandum reading as follows: “2. Add the following to paragraph # V. ‘ A first mortgage in the sum of $6,500 held by the Mutual Life Insurance Company, interest at 5y2% payable semi-annually, April and October, due date June 1,1940 ’.”
The testimony of Mr. Visco was given after he had, refreshed his recollection, as to the delivery of the papers, by examining on the .stand his office records which contained a notation made on the day the letter and memorandum were written and delivered to the respondent’s office. His testimony is as follows: “ By Mr. Lewis: Q. When do you say this entry of April 22, 1937, reading, ‘ Prepared letter and memo, together with retainer, affidavit of title, and delivered same to T. E. Shea’s office ’ was made ? A. At the time that I did that — when I returned to my office.”
The letter containing the memorandum and affidavits of title was delivered by Mr. Visco to the young lady in charge of the respondent’s office. Nevertheless the respondent submitted affidavits of title with no recital of an outstanding mortgage. In due course an award was made to the Tinsleys in the aggregate sum of $16,601.
The Tinsleys accompanied by the respondent and his clerk, Mr. Magnus, went to the office of the comptroller and executed papers similar in form to those executed by Matthews of the Stephens Fuel Company, referred to above, to the effect that there were no mortgages upon the property. The papers were executed in the office of the comptroller on April 20, 1938, in the presence of the respondent who examined the papers and approved the same.
The affidavits contained not only the representation that there was no mortgage on the property but concluded with the statement “ that the above statements are made for the purpose of inducing the City of New Yorlc to pay over to this deponent.the amount of the award made herein.”
When the Tinsleys received their check from the comptroller they went to the office of the respondent, along with Mr. Viseo. There the Tinsleys gave Mr. Visco their check for his fee. The following day Mr. Visco sent to the respondent a check for the latter’s share of the fee.
The respondent categorically denied the alleged conversations testified to by Mr. Jaegels and Mr. Matthews in the Stephens Fuel Company proceeding. He also denied that Mr. Visco ever spoke to him about a mortgage on the Tinsley property, and he denied that he received or ever saw the alleged *601 memorandum which- Mr. Visco testified he sent to respondent for the purpose of having inserted in the Tinsley affidavit of title so, as to recite the fact that a mortgage was outstanding on the property.
The respondent’s principal witness was a man named A. Edward Magnus. Mr. Magnus was a clerk and title searcher employed by Mr. Shea. At the time he testified before the official referee he had been working for Mr. Shea for thirteen years. Prior thereto he had worked for an attorney named John F. Meyer for from ten to thirteen years. He had also been employed by the New York Title Company, as a title searcher, for five years and had been employed by an attorney named John J. Buckley doing general office work and searching titles for some fifteen years. He was an experienced title searcher who had been employed as a searcher of titles or clerk in law offices or title companies for more than thirty years and was very familiar with the required practice.
Mr. Magnus testified that when the respondent told him about the condemnation matter he went to the office of the Corporation Counsel to obtain the form necessary for filing. He there obtained what is referred to as an 6 6 affidavit of title. ’ ’ He consulted an employee of the Corporation Counsel, from whom he received corporation affidavits and individual affidavits. He stated, on cross-examination, that he was told only a “ fee search ” was needed. He could not give-the name or identify the individual whom he claimed gave him that information.
Unable to obtain the deed to the Stephens property from that company, he went to the register’s office in the Bronx with a stenographer and there conducted a search of the title. This took three weeks. He then drew the necessary papers for signing by Mr. Jaegels and Mr. Matthews. It was brought out that the search made by Mr. Magnus on the Stephens property disclosed several references to a past mortgage on the property and that the affidavit of title submitted to the comptroller contained a deed recorded in 1919 whereby the Stephens Fuel Company acquired title to the property. That deed contained a reference to a mortgage on the property in favor of the Bowery Savings Bank.
The cross-examination of the respondent established that he had read the affidavit of title in the Tinsley proceeding. That affidavit contained a copy of an old deed recorded in February of 1920. The deed recited that the- property was- subject “ to a mortgage of $18,000, now a lien.” -The name of the mort *602 gagee, the Mutual Life Insurance Company, is not set forth in the affidavit of title.
Despite the fact that the respondent claimed that he had never inquired of his client as to the existence of a mortgage, it is significant that when he wrote to the Bar Association in answer to a request for a letter of explanation, he stated: “ The Corporation Counsel of the City of New York furnished claimants with the forms known as affidavits of title, which were prepared by the writer on behalf of each of the claimants above named ”.
“ Copies of these affidavits of title have been furnished and upon reference you will find that in the case of each claimant, Stephens Fuel Company, Inc. and Francis B. and Mary ■ C. Tinsley, there is a recitation of mortgage upon each separate parcel ”.
“ In the case of the Tinsley title search claimant presented the affidavit of title which mentioned the existence of a mortgage to the Mutual Life Insurance Company ’ ’.
When Mr. Magnus was being cross-examined, his attention was called to the last sheet of petitioner’s Exhibit 24. That exhibit is the title search which Magnus concededly made of the Stephens property. The last sheet, however, contained a description of a mortgage on a piece of property owned by persons named Poillon and located on the Mott Haven Canal. ' It was brought out that the sheet of paper in question was inserted in the exhibit by mistake. Questioning of Magnus about that description of a mortgage on the Poillon property disclosed that respondent represented the owners, as claimants, in condemnation proceedings brought to recover consequential damages for the closing of the canal. It was disclosed that the Poillons had induced “ the mortgagee to subordinate the award so that the Poillons could receive the award ”,
The disclosure of the proceedings in the Poillon case and the practice there followed and shown to be necessary in such a case clearly demonstrate that Mr. Magnus was aware that it was necessary to disclose the fact that a mortgage existed on a piece of property with respect to which consequential damages were sought.
While the hearings were proceeding before the referee, he inquired as to the legal effect on respondent’s fee of a mortgage on the property.

The petitioner contends that the cases hold that where the security of the mortgage has been impaired the mortgagee is entitled to the first claim upon the award, at least to the extent •that his security has been impaired.

*603 The lien of the mortgagee is superior to the lien of the attorney for the mortgagor. (Deering v. Schreyer, 171 N. Y. 451; Gates v. De La Mare, 142 N. Y. 307; Matter of City of New York [New Utrecht Ave.], 185 App. Div. 55.) In the latter case, at page 58, the court said: “ And there is no proof that the attorneys ever had any relations or communications with the mortgagees with reference to their retainer or their services. Doubtless the attorneys rendered services, and we may concede that the services enhanced the award, and yet these facts do not make for the attorneys as against the mortgagee, or Kelley the purchaser under the foreclosure.”
The testimony of Mr. Jaegels, Mr. Matthews and Mr. Visco, an atttorney, has not been satisfactorily answered by the respondent. Their testimony is strongly supported by the documentary evidence. It is far more convincing" than that given by the respondent and by Mr. Magnus. The documentary evidence alone is conclusive. It is true that the letter of Mr„ Visco in which he testified he enclosed the disputed memorandum did not refer to the memorandum. The office records of Mr. Visco, however, contained an entry showing that the memorandum was written and delivered to the office of the respondent. In any event, deeds, referring to the mortgages on the property involved, were in the possession of the respondent and alone were sufficient proof that he knew of the existence of the mortgages.
In the Poillou case, the respondent and his clerk fully recognized the importance of a mortgage and were conversant with the practice in such a case. There the respondent prepared and took to the office of the comptroller a release executed on February 24, 1928, several months before the awards were paid in the cases now under consideration. That release alone establishes that the respondent knew that if a mortgage were recited in an “ affidavit of title ” payment of the award would be made subject to the mortgage. That he knew this to be so even if no part of the land was taken, is established by the letter he wrote to Mr. Poillou enclosing the release.. That letter reads in part as follows: “ * * * as a result of the trial it was decided to close the entire Canal thus depriving your parcel of land of Canal access, as well as rendering the bulkhead facilities useless. No part of the land owned by you has been taken.”
In a lengthy proceeding of this kind where testimony is given as to conversations held and actions taken years before, it may be possible to find statements which seem to be inconsistent. Most of the apparent inconsistencies in the testimony of peti *604 tioner’s witnesses referred to by the respondent were fully explained when the witnesses were given an opportunity to do so.
It must be borne in mind that in this proceeding we are considering the conduct of an attorney with respect to two separate and distinct offenses. The witnesses called by the petitioner to support the charges were not related or in any way connected. It is important to note that the same practice was resorted to by the respondent in each proceeding.
A careful review of the record discloses that Mr. Shea knew that mortgages were in existence but he deliberately concealed them from the City of New York and obtained payment of the award to his clients. This enabled him under his retainer agreement to collect his fees in full from his clients, the owners, without being relegated to an action.
In our opinion the overwhelming weight of the credible evidence and the documentary evidence established the guilt of the respondent.
The respondent should be disbarred.
G-lexxox, Cohx and Peck, JJ., concur in Per Curiam opinion; Martix, P. J., dissents in opinion in which Towxley, J., concurs.
Reference ordered. Settle order on notice.